Matthew R. Mendelsohn, Esq. (Attorney ID: 015582005)
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 228-9898
*Attorneys for Plaintiffs*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KYANA THOMPSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE PLASTIC SURGERY CENTER, P.A.<br><br>Defendant. | Case No.:<br><br>*CIVIL ACTION*<br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiff Kyana Thompson ("Plaintiff"), individually and on behalf of a class of all those similarly situated (the putative "Class" or "Class Members"), upon personal knowledge of the facts pertaining to Plaintiff and on information and belief as to all other matters, and upon the investigation conducted by Plaintiff's' counsel, complains against Defendant The Plastic Surgery Center, P.A. ("TPSC" or "Defendant"), and alleges on information and belief as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff and other Class Members are individuals whose Personally Identifiable Information ("PII") and Personal Health Information ("PHI"; collectively with PII, the "Personal Information")—including names, dates of birth, driver's license and/or passport numbers, social security numbers, Taxpayer IDs, financial account and payment card information, biometric data,

and medical and health insurance information—was compromised due to Defendant's failure to implement and maintain reasonable safeguards to protect such information in Defendant's custody and control.

2. This class action seeks to redress Defendant's unlawful and negligent disclosure of approximately of thousands of TPSC patients' Sensitive Information in a data breach that was first detected on November 4, 2024 (the "Data Breach" or "Breach"), in violation of state statutory and common law. At the time of the Data Breach, Defendant's inadequate security measures allowed unauthorized individuals to access Defendant's computer network and obtain a copy of Plaintiff's and other Class Members' Personal Information.

3. TPSC, based in Shrewsbury, New Jersey, is a private medical practice established in 1974 that employs 32 surgeons and has more than 20 locations in New Jersey, New York and Pennsylvania.

4. On or about April 4, 2025 TPSC completed its review of the Data Breach and confirmed that some personal information may have been affected. By letter dated April 18, 2025, and received several days later, Plaintiff was informed that her patient information was part of the Data Breach.

5. Defendant has a duty to safeguard and protect customer information entrusted to them and could have prevented this theft with adequate security measures.

6. Plaintiff and Class Members entrusted Defendant with, and allowed Defendant to gather, highly sensitive information relating to their health and other matters as part of seeking medical treatment. They did so in confidence, and they had the legitimate expectation that Defendant would respect their privacy and act appropriately, including only sharing their information with vendors and business associates who were equipped to protect it.

7. Trust and confidence are key components of Plaintiff's and Class Members' relationship with Defendant. Without it, Plaintiff and Class Members would not have provided Defendant with, or allowed Defendant to collect, their most sensitive information in the first place; Plaintiff and Class Members relied upon Defendant to keep their information secure (as Defendant is required by law to do).

8. Plaintiff brings this class action because Defendant collected and failed to secure and safeguard numerous patients' Personal Information—such as Plaintiff's and Class Members' names, dates of birth, Social Security numbers, driver's license numbers, financial account information, health insurance policy numbers, Medical Record Numbers, Medicaid or Medicare IDs, and health information such as treatment and diagnostic information.

9. Thousands of patients had their Personal Information compromised in the Data Breach. As a result of Defendant's failure to protect the consumer information they were entrusted with safeguarding, Plaintiff and Class Members suffered a loss of the value of their Personal Information—and have been exposed to or are at imminent and significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future.

10. Defendant's intentional, willful, reckless, unfair, and negligent conduct—failing to prevent the breach, failing to limit its severity, and failing to detect it in a timely fashion—harmed Plaintiff and Class Members uniformly. For this reason, Defendant should pay for monetary damages and appropriate identity theft protection services, as well as reimburse Plaintiff for the costs caused by Defendant's substandard security practices and failure to timely disclose the same. Plaintiff is likewise entitled to injunctive and other equitable relief that safeguards their information, requires Defendant to significantly improve their data security, and provides independent, expert oversight of Defendant's security systems.

11. Defendant has also been unfairly and unjustly enriched because of their improper conduct, such that it would be inequitable for them to retain the benefits conferred upon them by Plaintiff and the Class Members. Plaintiff never would have engaged TPSC to perform medical services and entrusted Defendant with her Personal Information had she known that Defendant would permit unauthorized access to her Personal Information by Defendant's complete and utter disregard for security safeguards and protocols. Plaintiff would have used other providers.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists as Defendant is a citizen of a State different from that of at least one Class Member.

13. This Court has personal jurisdiction over Defendant because it maintains its principal place of business in this District.

**PLAINTIFF**

14. Plaintiff Kyana Thompson is a natural person residing in Trenton, New Jersey. She is a citizen of New Jersey.

15. Plaintiff Thompson received medical services from Defendant and supplied Defendant with her Personal Information as a precondition for receiving such care.

16. Plaintiff Thompson has no known relationship with Defendant other than receiving medical services from TPSC and receiving a breach notice in April 2025.

17. In order to receive healthcare services, Plaintiff Thompson had to provide her Personal Information to TPSC.

18. Plaintiff Thompson trusted that TPSC would use reasonable measures to protect

her information, including complying with state and federal law.

19. Additionally, Plaintiff Thompson has received numerous spam emails and calls since she provided her information to Defendant, including spam purporting to offer various medical and medically-related services.

Commented [M1]: Is this accurate?

20. Plaintiff Thompson is aware of no other source from which the theft of her Personal Information could have come.

21. Plaintiff Thompson suffered actual injury in the form of damages to and diminution of the value of her Personal Information—which she entrusted to Defendant and which was compromised in the Data Breach.

22. Plaintiff Thompson suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse from her Personal Information being accessed and exfiltrated by hackers. This injury was exacerbated by Defendant's delay in revealing the Data Breach.

23. Plaintiff Thompson has a continuing interest in ensuring that her Personal Information, which remains with Defendant, is protected and safeguarded from future breaches.

## DEFENDANT

24. Defendant The Plastic Surgery Center, P.A. is a New Jersey association with its principal place of business in Shrewsbury, New Jersey.

## FACTUAL ALLEGATIONS

### A. Defendant's Collection Of Personal Information

25. TPSC, based in Shrewsbury, New Jersey, is a private medical practice established in 1974 that employs 32 surgeons and has more than 20 locations in New Jersey, New York and Pennsylvania.

26. TPSC obtains Class Members' Personal Information when patients receive care. This includes, upon information and belief:

a. Contact information;

b. Authentication information such as driver's licenses and Social Security Numbers;

c. Demographic information;

d. Payment information; and

e. Medical history as reported by patients and/or other healthcare providers.

27. Obtaining this information is a precondition for receiving TPSC's services.

**B. <u>The Data Breach</u>**

28. On November 4, 2024, TPSC's contracted billing company belatedly detected "suspicious activity within its network."[1] The impacted information may include names, dates of birth, driver's license and/or passport numbers, social security numbers, Taxpayer IDs, financial account and payment card information, biometric data, and medical and health insurance information"[2]

29. According to TPSC's own data breach notification, as a result of the hack, an unauthorized person gained "unauthorized access to some systems and the exfiltration of certain files."[3]

30. The notification does not describe any concrete security measures or enhanced network safety precautions that TPSC has implemented aside from "enhancing our data security protocols to help prevent future incidents."[4]

[1] *See* https://tpscnotice.com/ (last visited April 29, 2025).
[2] *Id.*
[3] *Id.*
[4] *Id.*

**C. Defendant Failed To Safeguard Patients' Personal Information.**

31. Defendant failed to exercise reasonable care in protecting patients' Personal Information.

32. Defendant has a non-delegable duty under federal law to ensure that all information it collects and stores are secure, and that any associated entities with whom they shared information maintain adequate and commercially reasonable data security practices to ensure the protection of patients' Personal Information.

33. Defendant knows that its patients must trust that it is keeping their health information private and secure.[5] TPSC own Notice of Privacy Practices stresses that any patient information it obtains may only be disclosed for certain limited purposes and acknowledges TPSC's legal obligation to "maintain the privacy of your PHI."[6] If TPSC's patients lack trust in it or knew it would insecurely store, safeguard, or transmit their personal information, then they would not disclose health information to it and will choose a different provider for services.

34. More specifically, to provide services to patients, Defendant must keep its patients' health information private and secure. If patients lack trust in it or knew they would insecurely store, safeguard, or transmit their personal information or fail to establish or follow data security policies and protocols, patients will not disclose health information to it and will choose a different provider for services.

35. Defendant is an entity covered by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), *see* 45 C.F.R. § 160.102, and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and

---

[5] *See* TPSC HIPAA Notice of Privacy Practices, https://21158918.fs1.hubspotusercontent-na1.net/hubfs/21158918/PSC%20-%20HIPAA%20Notice%20of%20Privacy%20Practices.pdf (last visited April 29, 2025).
[6] *Id.*

E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

36. These rules establish national standards for the protection of patient information, including protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. *See* 45 C.F.R. § 160.103.

37. HIPAA limits the permissible uses of "protected health information," prohibits unauthorized disclosures of "protected health information," and requires that Defendant implement appropriate safeguards for this information.

38. HIPAA further requires that Defendant provide notice of a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons—i.e., non-encrypted data.

**D. Defendant Violated Regulatory Guidance**
**<u>And HIPAA's Requirements To Safeguard Data.</u>**

39. Defendant failed to maintain the privacy and security of their patients' PHI and failed to inform patients that their Personal Information was disclosed. Indeed, Defendant violated HIPAA by failing to:

a. Maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Adequately protect Plaintiff's and the Class Members' Personal Information;

c. Ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted in violation of 45 C.F.R. § 164.306(a)(1);

d. Implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e. Implement adequate policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g. Protect against reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

h. Ensure compliance with the electronically protected health information security standard rules by their workforces, in violation of 45 C.F.R. § 164.306(a)(4).

40. Additionally, federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission ("FTC") has issued numerous guides for businesses highlighting the importance of reasonable data security practices, which should be factored into all business-related

decision-making.[7]

41. The FTC's *Protecting Personal Information: A Guide for Business* sets forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data. Among other things, it notes that businesses should: (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[8]

42. Additionally, the FTC recommends that organizations limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.[9]

43. The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data

[7] FTC, *Start With Security: A Guide for Businesses*, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed April 29, 2025).
[8] *Id.*
[9] *Id.*

security obligations.[10]

44. Defendant was fully aware of their obligations to implement and use reasonable measures to protect the PII and PHI of its patients but failed to comply with these basic recommendations and guidelines that would have prevented the Data Breach from occurring.

**E. <u>Plaintiffs' And Class Members' Personal Information Is Highly Valuable.</u>**

45. Defendant was or should have been aware that it was collecting highly valuable data, for which Defendant knew or should have known there is an upward trend in data breaches in recent years.[11]

46. The U.S. Department of Health and Human Services, Office for Civil Rights, lists the Data Breach as one of the largest healthcare breaches reported in 2022.[12]

47. As early as 2014, the FBI alerted the healthcare industry that they were an increasingly preferred target of threat actors, stating "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or Personally Identifiable Information (PII)" so that these companies can take the necessary precautions to thwart such attacks.[13]

48. Further, Cathy Allen, CEO of Shared Assessments, a cyber-risk management

---

[10] FTC, *Privacy and Security Enforcement*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last accessed April 29, 2025).

[11] Healthcare Data Breach Statistics, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last accessed April 29, 2025) ("Our healthcare data breach statistics clearly show there has been an upward trend in data breaches over the past 10 years.").

[12] U.S. Dep't of Health and Human Services, Office for Civil Rights, *Cases Currently Under Investigation*, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed April 29, 2025).

[13] Jim Finkle, *FBI warns healthcare firms they are targeted by hackers*, REUTERS, Aug. 20, 2014, http://www.reuters.com/article/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820 (last accessed April 29, 2025).

group, stated that "just the types of test proscribed might indicate a type of illness that you would not want employers or insurance companies to have. Thieves often steal and resell insurance data on the internet . . . having other information makes the data more valuable and the price higher."[14] Personal Information is a valuable commodity to identity thieves. Compromised Personal Information is traded on the "cyber black-market." As a result of recent large-scale data breaches, identity thieves and cybercriminals have openly posted stolen credit card numbers, Social Security numbers, and other Personal Information directly on various dark web[15] sites making the information publicly available.[16]

49. Healthcare data is especially valuable on the black market. According to one report, a healthcare data record may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[17]

50. According to a *Reuters* investigation that included interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data for sale on underground markets "includes names, birth dates, policy numbers, diagnosis codes, and billing information" which fraudsters commonly use "to create fake IDs to buy medical equipment or

---

[14] *Id.*

[15] The dark web refers to encrypted content online that cannot be found using conventional search engines and can only be accessed through specific browsers and software. MacKenzie Sigalos, *The dark web and how to access it* (April 29, 2025), https://www.cnbc.com/2018/04/13/the-dark-web-and-how-to-access-it.html (last accessed April 29, 2025).

[16] *Here's How Much Your Personal Information Is Selling for on the Dark Web,* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed April 29, 2025); McFarland et al., *The Hidden Data Economy*, at 3, https://www.mcafee.com/enterprise/en-us/assets/reports/rp-hidden-data-economy.pdf (last accessed April 29, 2025).

[17] *Hackers, Breaches, and the Value of Healthcare Data* (June 20, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers/ (last accessed April 29, 2025).

drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[18]

51. According to Tom Kellermann, chief cybersecurity officer of cybersecurity firm Carbon Black, "Health information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10 personal identifying characteristics of an individual."[19] For this reason, a patient's full medical records can sell for up to $1,000 on the dark web, while credit card numbers and Social Security numbers may cost $5 or less.[20]

52. As noted by Paul Nadrag, a software developer for medical device integration and data technology company Capsule Technologies: "The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit

[18] Jim Finkle, *Your medical record is worth more to hackers your credit card*, Reuters, https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924 (last accessed April 29, 2025).

[19] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed April 29, 2025).

[20] Paul Nadrag, *Here's How Much Your Personal Information Is Selling for on the Dark Web* (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited April 29, 2025).

cards and fraudulent loans."[21]

**F. Defendant Harmed Plaintiff And Class Members**
**<u>By Allowing Criminals To Access Their Information.</u>**

53. Defendant knew or should have known both that medical information is incredibly valuable to threat actors and that healthcare data breaches are on the rise. Accordingly, Defendant was on notice for the harm that could ensue if it failed to protect patients' data. Given the sensitive nature of the Personal Information stolen in the Data Breach—including Social Security number, date of birth, driver's license number, financial account information, health insurance policy number, Medical Record Number, Medicaid or Medicare ID, and health information such as treatment and diagnosis info—threat actors have the ability to commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future.

54. The PII and PHI exposed in the Data Breach are highly coveted and valuable on underground or black markets.

55. Identity thieves can use the stolen information to: (a) create fake credit cards that can be swiped and used to make purchases as if they were the real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits; (f) file a fraudulent tax return using the victim's information; (g) commit medical and healthcare-related fraud; (h) access financial accounts and records; or (i) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police

[21] *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web* (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web (last visited April 29, 2025).

during an arrest. Further, loss of private and personal health information can expose the victim to loss of reputation, loss of employment, blackmail, extortion, and other negative effects.

56. While federal law generally limits an individual's liability for fraudulent credit card charges to $50, there are no such protections for a stolen medical identity. According to a 2015 survey on medical identity theft conducted by the Ponemon Institute, victims of medical identity theft spent an average of $13,500 in out-of-pocket costs to resolve the crime.[22] Frequently, this information was used to obtain medical services or treatments (59%), obtain prescription drugs (56%), or receive Medicare and Medicaid benefits (52%). Only 14% of respondents said that identity thieves used the information to obtain fraudulent credit accounts, indicating that medical information is a much more profitable market.[23]

57. According to the Ponemon study, "[t]hose who have resolved the crime spent, on average, more than 200 hours on such activities as working with their insurer or healthcare provider to make sure their personal medical credentials are secured and can no longer be used by an imposter and verifying their personal health information, medical invoices and claims and electronic health records are accurate."[24]

58. Additionally, the study found that medical identity theft can have a negative impact on reputation, as 45% of respondents said that medical identity theft affected their reputation mainly because of embarrassment due to disclosure of sensitive personal health conditions, with 19% responding that they missed out on employment opportunities as a result.[25]

[22] *Ponemon Institute, Fifth Annual Study on Medical Identity Theft*, https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 (last accessed April 29, 2025).
[23] *Id*. at 9.
[24] *Id*. at 2.
[25] *Id*. at 14.

59. Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[26] In some cases, victims may not even be able to access medical records using their personal information because they include a false name or data points taken from another person's records. Consequently, only 10% of medical identity theft victims responded that they "achiev[ed] a completely satisfactory conclusion of the incident."[27]

60. Moreover, it can take months or years for victims to even discover they are the victim of medical-related identity theft or fraud, given the difficulties associated with accessing medical records and healthcare statements. For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;
- Get contacted by a debt collector about medical debt they do not owe;
- See medical collection notices on their credit report that they do not recognize;
- Find erroneous listings of office visits or treatments on their explanation of benefits;
- Receive information from their health plan that they have reached their limit on benefits; or
- Be denied insurance because their medical records show a condition they do not have.[28]

61. Other types of medical fraud include "leveraging details specific to a disease or

---

[26] *Id*. at 1.
[27] *Id*.
[28] *FTC, Medical Identity Theft FAQs for Health Care Providers and Health Plans*, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last accessed April 29, 2025).

terminal illness, and long-term identity theft."[29] According to Tom Kellermann, "Traditional criminals understand the power of coercion and extortion. By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[30] Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

62. As explained further by the FTC, medical identity theft can have other serious consequences:

> Medical ID thieves may use your identity to get treatment – even surgery – or to bilk insurers by making fake claims. Repairing damage to your good name and credit record can be difficult enough, but medical ID theft can have other serious consequences. If a scammer gets treatment in your name, that person's health problems could become a part of your medical record. It could affect your ability to get medical care and insurance benefits, and could even affect decisions made by doctors treating you later on. The scammer's unpaid medical debts also could end up on your credit report.[31]

63. As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. losing the inherent value of their Personal Information;

b. identity theft and fraud resulting from the theft of their Personal Information;

---

[29] Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed April 29, 2025).
[30] *Id.*
[31] *Medical ID Theft: Health Information for Older People*, Federal Trade Commission, https://web.archive.org/web/20201019075254/https://www.consumer.ftc.gov/articles/0326-medical-id-theft-health-information-older-people (last accessed April 29, 2025).

c. costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

d. costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

e. unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

f. lowered credit scores resulting from credit inquiries following fraudulent activities;

g. costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, canceling, and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts; and

h. the continued imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Personal Information being in possession of one or many unauthorized third parties.

64. Even in instances where a consumer is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again, as there is typically significant time and effort associated with seeking reimbursement that is not refunded. The Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[32]

65. There may also be a significant time lag between when personal information is stolen and when it is actually misused. According to the GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.

[32] E. Harrell, U.S. Department of Justice, *Victims of Identity Theft, 2014* (revised Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (last accessed April 29, 2025).

> Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

66. Plaintiff and Class Members place significant value on data security. According to a recent survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[34]

67. Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, Defendant would have no reason to tout their data security efforts to their actual and potential customers.

68. Consequently, had consumers known the truth about Defendant's data security practices—that they did not adequately protect and store their Personal Information—they would not have entrusted their Personal Information to Defendant.

**<u>CLASS ACTION ALLEGATIONS</u>**

69. Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of the following nationwide class (the "Nationwide Class" or the "Class"):

> All natural persons residing in the United States whose PII and/or PHI was compromised in the Data Breach.

---

[33] U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent Is Unknown* (2007), http://www.gao.gov/new.items/d07737.pdf (last accessed April 29, 2025).
[34] FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 2016), https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited April 29, 2025).

70. The Nationwide Class asserts claims against Defendant for negligence (Count 1), negligence *per se* (Count 2), breach of confidence (Count 3), unjust enrichment (Count 4), breach of express contract (Count 5), breach of implied contract (Count 6), and violations of the New Jersey Consumer Fraud Act (NJCFA) (Count 7).

71. Excluded from the Class are Defendant, any entity in which any Defendant has a controlling interest, and any Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

72. Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

73. **Numerosity.** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, upon information and belief thousands of its customers' Personal Information has been compromised. Those individuals' names and addresses are available from Defendant's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

74. **Commonality.** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a. Whether Defendant had a duty to protect Personal Information;

b. Whether Defendant failed to take reasonable and prudent security measures;

c. Whether Defendant was negligent in failing to implement reasonable and adequate security procedures and practices;

d. Whether Defendant's security measures to protect their systems were reasonable in light of known legal requirements;

e. Whether Defendant's efforts (or lack thereof) to ensure the security of patients' Personal Information were reasonable in light of known legal requirements;

f. Whether Defendant's conduct constituted unfair or deceptive trade practices;

g. Whether Defendant violated state law when they failed to implement reasonable security procedures and practices;

h. Which security procedures and notification procedures Defendant should be required to implement;

i. Whether Defendant violated state consumer protection and data breach statutes in connection with the actions described herein;

j. Whether Defendant failed to notify Plaintiff and Class Members as soon as practicable and without delay after the data breach was discovered;

k. Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach and/or the loss of the Personal Information of Plaintiff and Class Members;

l. Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Defendant's failure to reasonably protect their Personal Information; and

m. Whether Plaintiff and Class Members are entitled to damages or injunctive relief.

75. **Typicality.** Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of other Class Members. Plaintiff's Personal Information was in Defendant's possession at the time of the Data Breach and was compromised as a result of the Data Breach. Plaintiff's damages and injuries are akin to other Class Members and Plaintiff seeks relief consistent with the relief of the Class.

76. **Adequacy.** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's counsel is competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

77. **Predominance & Superiority.** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because those issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be

impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

78. **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for Defendant or would be dispositive of the interests of members of the proposed Class.

79. **Ascertainability.** The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. The Class consists of individuals who received services and whose information was supplied to Defendant. Class members can be determined using Defendant's records in its databases, which is presumably also how Defendant was able to provide notice of breach letters to Plaintiff and Class Members.

80. **Injunctive Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive relief appropriate to the Class as a whole. Injunctive relief is necessary to uniformly protect the Class Members' data. Plaintiff seeks prospective injunctive relief as a wholly separate remedy from any monetary relief.

81. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Personal Information;

b. Whether Defendant failed to take commercially reasonable steps to safeguard the Personal Information of Plaintiff and the Class Members;

c. Whether Defendant was unfairly and unjustly enriched as a result of their improper conduct, such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the other Class Members; and

d. Whether adherence to HIPAA regulations, FTC data security recommendations, industry standards, and measures recommended by data security experts would have reasonably prevented the Data Breach.

**COUNT 1**
**NEGLIGENCE**

82. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

83. Defendant required Plaintiff and Class Members to submit Personal Information to access its health services. Defendant collected and stored the Personal Information for commercial gain.

84. Defendant knew or should have known that its systems were vulnerable to unauthorized access and exfiltration by third parties.

85. Defendant had a non-delegable duty to maintain adequate and commercially reasonable data security practices to ensure the protection of patients' Personal Information.

86. Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members'

Personal Information within their control from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

87. Defendant owed a duty of care to Plaintiff and Class Members to provide security, consistent with industry standards, to ensure that the systems and networks adequately protected the Personal Information.

88. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. The special relationship arose because Plaintiff and Class Members entrusted Defendant with their confidential data as part of the health treatment process. Only Defendant was in a position to ensure that it had sufficient safeguards to protect against the harm to Plaintiff and Class Members that would result from a data breach.

89. Defendant's duty to use reasonable care in protecting Personal Information arose as a result of the common law and the statutes and regulations, as well as their own promises regarding privacy and data security to patients. This duty exists because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. By collecting and maintaining personal and confidential information of Plaintiff and Class Members and acknowledging that this information needed to be kept secure, it was foreseeable that they would be harmed in the future if Defendant did not protect Plaintiff's and Class Members' information from threat actors.

90. Defendant's duties also arose under HIPPA regulations, which, as described above, applied to Defendant and established national standards for the protection of patient information, including protected health information, which required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place

appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). The confidential data at issue in this case constitutes "protected health information" within the meaning of HIPAA.

91. Defendant's duties also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect personal and confidential information. Various FTC publications and data security breach orders further form the basis of Defendant's duty. In addition, several individual states have enacted statutes based upon the FTC Act that also created a duty.

92. Defendant knew or should have known, of the risks inherent in collecting and storing Personal Information, the vulnerabilities of its systems, and the importance of adequate security.

93. Defendant breached its common law, statutory, and other duties – and thus was negligent – by failing to use reasonable measures to protect patients' Personal Information.

94. Defendant breached its duties to Plaintiff and Class Members in numerous ways, including by:

a. Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiff's and Class Members' Personal Information;

b. Failing to comply with industry-standard data security standards during the period of the Data Breach;

c. Failing to comply with regulations protecting the Personal Information at issue during the period of the Data Breach;

d. Failing to adequately monitor, evaluate, and ensure the security of Plaintiff's network and systems;

e. Failing to recognize in a timely manner that Plaintiff's and other Class Members' Personal Information had been compromised; and

95. Plaintiff's and Class Members' Personal Information would not have been compromised but for Defendant's wrongful and negligent breach of their duties.

96. Defendant's failure to take proper security measures to protect sensitive Personal Information of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiff's and Class Members' Personal Information.

97. It was also foreseeable that Defendant's failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiff and Class Members as described in this Complaint.

98. Neither Plaintiff nor the other Class Members contributed to the Data Breach and subsequent misuse of their Personal Information.

99. As a direct and proximate cause of Defendant's conduct, Plaintiff and Class Members suffered damages and will suffer damages including, but not limited to: damages arising from identity theft or fraud; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take

years to discover and detect; and loss of the value of their privacy and confidentiality of the stolen confidential data, including health data.

**COUNT 2**
**NEGLIGENCE PER SE**

100. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

101. Defendant is an entity covered by HIPAA (45 C.F.R. § 160.102) and, as such ,required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

102. HIPAA requires Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

103. HIPAA further requires Defendant to disclose the unauthorized access and theft of the Personal Information to Plaintiff and Class Members "without unreasonable delay" so that Plaintiff and Class Members can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Personal Information. *See* 45 C.F.R. §§ 164.404, 406, 410.

104. Defendant violated HIPAA by failing to reasonably protect Plaintiff's and Class Members' Personal Information, as described herein.

105. Defendant's violations of HIPAA constitute negligence per se.

106. Plaintiff and Class Members are within the class of persons that HIPAA was intended to protect.

107. The harm that occurred as a result of the Data Breach is the type of harm HIPAA was intended to guard against.

108. Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Personal Information. 15 U.S.C. § 45(a)(1).

109. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

110. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Personal Information and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Personal Information it obtained, stored, and disseminated, and the foreseeable consequences of a data breach involving companies as large as TPSC, including, specifically, the immense damages that would result to Plaintiff and Class Members.

111. Defendant's violations of Section 5 of the FTC Act constitute negligence per se.

112. Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

113. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

114. As a direct and proximate result of Defendant's negligence per se under HIPAA and the FTC Act, Plaintiff and Class Members have suffered, continue to suffer, and will suffer, injuries, damages, and harm as set forth herein.

115. Plaintiff and the Class seek damages, injunctive relief, and other and further relief as the Court may deem just and proper.

**COUNT 3**
**BREACH OF CONFIDENCE**

116. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

117. Plaintiff and Class Members maintained a confidential relationship with Defendant whereby Defendant undertook a duty not to disclose the Personal Information provided by Plaintiff and Class Members to Defendant to unauthorized third parties. Such Personal Information is confidential and novel, highly personal and sensitive, and not generally known.

118. Defendant knew Plaintiff's and Class Members' Personal Information was being disclosed in confidence and understood the confidence was to be maintained, including by expressly and implicitly agreeing to protect the confidentiality and security of the Personal Information it collected, stored, and maintained. Defendant's privacy policy makes its express and implicit promise to safeguard its patients' data very clear.

119. Defendant required Plaintiff and Class Members to provide their Personal Information to them in order to receive medical treatment.

120. As a result of the Data Breach, there was an unauthorized disclosure of Plaintiff's and Class Members' Personal Information an intentional, knowing, and or negligent breach of this duty. The unauthorized disclosure occurred because Defendant failed to implement and maintain reasonable safeguards to protect the Personal Information in their possession and failed to comply

with industry-standard data security practices.

121. Plaintiff and Class Members were harmed by way of an unconsented disclosure of their confidential information to an unauthorized third party.

122. As a direct and proximate result of Defendant's breach of confidence, Plaintiff and Class Members suffered an injury and sustained actual losses and damages as alleged herein. Plaintiff and Class Members alternatively seek an award of nominal damages.

**COUNT 4**
**UNJUST ENRICHMENT**

123. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

124. For years and continuing to today, Defendant's business models depended upon patients entrusting them with their Personal Information. Trust and confidence are critical and central to both the services provided by Defendant to patients. The collection of data is central to its provision of care.

125. Unbeknownst to Plaintiff and Class Members, however, Defendant failed to reasonably or adequately secure, safeguard, and otherwise protect Plaintiff's and Class Members' Personal Information. Defendant's deficiencies described herein were contrary to its security messaging.

126. Plaintiff and Class Members engaged Defendant for services and provided Defendant with, and allowed Defendant to collect, their Personal Information on the mistaken belief that Defendant complied with its duty to safeguard and protect patients' Personal Information. Defendant knew that the manner in which it maintained and transmitted patients' Personal Information violated its fundamental duties to Plaintiff and Class Members by disregarding industry-standard security protocols to ensure confidential information was securely

transmitted and stored.

127. Defendant had within its exclusive knowledge at all relevant times the fact that they had failed to implement adequate security measures to keep patients' Personal Information secure. This information was not available to Plaintiff, Class Members, or the public at large.

128. Defendant also knew that Plaintiff and Class Members expected that their information would be kept secure against known security risks vetted before they received patients' Personal Information. This expectation arises in part from Defendant's own messaging, including its privacy policy. And based on this expectation and trust, Defendant knew that Plaintiff and Class Members would not have disclosed health information to it and would have chosen a different provider for services.

129. Plaintiff and Class Members did not expect that Defendant would store or transmit their Personal Information insecurely.

130. Had Plaintiff and Class Members known about Defendant's deficient security practices, Plaintiff and Class Members would not have engaged Defendant to perform any services and would never have provided Defendant with their Personal Information.

131. By withholding these material facts, Defendant put its own interests ahead of its patients' interests and benefitted itself to the detriment of Plaintiff and Class Members.

132. As a result of their conduct as alleged herein, Defendant sold more services than it otherwise would have and was able to charge Plaintiff and Class Members when they otherwise could not have. Defendant was unjustly enriched by charging and collecting for those services to the detriment of Plaintiff and Class Members.

133. To be sure, this is not a question of whether Defendant misused patients' Personal Information. It is more foundational. Defendant promised to protect and safeguard Plaintiff's and

Class Members' Personal Information at all times (from the inception of their relationship of trust and confidence) and never would have performed any services of value enabling them to bill or collect payment but for Defendant's unfair and deceptive practices.

134. It would be inequitable, unfair, and unjust for Defendant to retain these wrongfully obtained benefits. Defendant's retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

135. Defendant's defective security and their unfair and deceptive conduct have, among other things, caused Plaintiff and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their private Personal Information.

136. Plaintiff and member of the proposed Class is entitled to restitution and non-restitutionary disgorgement in the amount by which Defendant was unjustly enriched, to be determined at trial. Plaintiff and the Class seek damages, injunctive relief, and other and further relief as the Court may deem just and proper.

## COUNT 5
## BREACH OF EXPRESS CONTRACT

137. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

138. Plaintiff and Class Members entered into written agreements with Defendant as part of, and as a precondition to, receiving medical services at TPSC. These agreements contained or incorporated representations that Defendant would protect Class Members' personal information and, on information and belief, include or incorporate Defendant's Privacy Policy. Defendant's Privacy Policy is evidence that data security was a material term of these contracts.

139. The agreements involved a mutual exchange of consideration whereby Defendant provided medical services for Class Members in exchange for payment from Class Members.

140. Plaintiff and Class members complied with the express contract when they paid TPSC, directly or through an insurance carrier and provided their Personal Information to TPSC.

141. Defendant's Privacy Policy and other express representations to patients include Defendant's rights and obligations regarding Plaintiff's and the Class's personal information.

142. Defendant's failure to protect Plaintiff's and Class Members' personal information constitutes a material breach of the terms of the agreement by Defendant as reflected, *inter alia*, in its Privacy Policy.

143. As a direct and proximate result of Defendant's breach of contract with Plaintiff and Class Members, Plaintiff and Class Members have been irreparably harmed.

144. Plaintiff and the Class seek damages, injunctive relief, and other and further relief as the Court may deem just and proper.

**COUNT 6**
**BREACH OF IMPLIED CONTRACT**

145. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

146. Plaintiff and Class Members were required to provide their Personal Information to the Defendant as a condition of their use of its services.

147. Plaintiff and Class Members paid money to the Defendant in exchange for services, along with the Defendant's promise to protect their Personal Information from unauthorized access and disclosure. Defendant's privacy policy is clear that TPSC will only disclose patient information for specific, enumerated purposes.

148. Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide Personal Information was the latter's obligation to: (a) use such Personal Information for business purposes only, (b) take reasonable steps to safeguard that Personal Information, (c)

prevent unauthorized disclosures of the Personal Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Personal Information, (e) reasonably safeguard and protect the Personal Information of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the Personal Information only under conditions that kept such information secure and confidential.

149. When Plaintiff and Class Members provided their PII and PHI to the Defendant, they entered into implied contracts with the Defendant pursuant to which Defendant agreed to reasonably protect such information.

150. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

151. Defendant's failure to safeguard the data in its care represents a breach of its implicit agreement with Plaintiff and the Class.

152. Plaintiff and the Class seek damages, injunctive relief, and other and further relief as the Court may deem just and proper.

**COUNT 7**
**NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. Ann. § 56:8-2**

153. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

154. The NJCFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of

such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. § 56:8-2.

155. Plaintiff, Class Members, and TPSC are "persons" as defined by N.J. Stat. Ann. § 56:8-1.

156. Under the NJCFA, the definition of "merchandise" includes "services." N.J. Stat. Ann. § 56: 8-1. Defendant TPSC's medical services are included within this definition.

157. As maintaining the security of personal information is included within the medical services Defendant TPSC provides, that maintenance is included within the definition of "merchandise" under N.J. Stat. Ann. §56:8-1.

158. By the acts and conduct alleged herein, Defendant concealed and suppressed material facts with the intent that its patients might rely upon that concealment:

a. promising to maintain the privacy and security of Plaintiff's protected health information as required by law;

b. failing to maintain adequate computer systems and data security practices to safeguard Private Information;

c. failing to disclose that its computer systems and data security practices were inadequate to safeguard Private Information from theft;

d. continued gathering and storage of Personal Information after Defendant knew or should have known of the security vulnerabilities of its computer systems that were exploited in the Data Breach; and

e. their continued gathering and storage of PII and PHI after Defendant knew or should have known of the Data Breach and before Defendant allegedly remediated the data security incident.

159. These unfair acts and practices violated duties imposed by laws, including but not limited to, the Federal Trade Commission Act, HIPAA, and N.J. Stat. Ann. § 56:8-2.

160. The foregoing deceptive acts and practices were directed at consumers.

161. The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the character of the services provided, specifically as to the safety and security of Plaintiff's and Class Members' Personal Information.

162. Defendant's unconscionable commercial practices, false promises, misrepresentations, and omissions set forth are material in that they relate to matters which reasonable persons, including Plaintiff and Class Members, would attach importance to in making their decisions and/or conducting themselves regarding the services received from Defendant.

163. Plaintiff and Class Members are consumers who paid for healthcare services and treatments provided by Defendant.

164. Defendant's acts, practices, and omissions were done in the course of Defendant's business of furnishing healthcare-related services to consumers in the State of New Jersey.

165. As a direct and proximate result of Defendant's multiple, separate violations of N.J. Stat. Ann. § 56:8-2., Plaintiff and Class Members suffered damages including, but not limited to: (i) actual identity theft; (ii) the compromise, publication and/or theft of their Personal Information; (iii) out of pocket expenses associated with the prevention, detection and recovery from identity theft and/or unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to, efforts spent researching how to prevent, detect, contest and recover from identity theft; (v) the continued risk to their Personal Information, which remains in Defendant's possession and is subject to further

unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Personal Information in its continued possession; (vi) future costs in terms of time, effort and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

166. Also, as a direct result of Defendant's violation of N.J. Stat. Ann. § 56:8-2., Plaintiff and Class Members are entitled to damages as well as injunctive relief, including, but not limited to, ordering Defendant to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures and (iii) immediately provide and continue to provide adequate credit monitoring to Class Members.

167. Plaintiff brings this action on behalf of herself and Class Members for the relief requested above and for the public benefit to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class Members and the public from Defendant's unfair, deceptive and unlawful practices. Defendant's wrongful conduct, as alleged in this Complaint, has had a widespread impact on the public at large.

168. Defendant knew or should have known that their network systems and data security practices were inadequate to safeguard Class Members' Personal Information and that the risk of a data security incident was high.

169. Plaintiff and Class Members were injured because: (i) they would not have paid for services provided by Defendant had they known the true nature and character of Defendant's data security practices; (ii) Plaintiff and Class Members would not have entrusted their Personal Information to Defendant in the absence of promises that Defendant would keep their information

reasonably secure, and (iii) Plaintiff and Class Members would not have entrusted their Personal Information to Defendant in the absence of the promise to monitor their computer systems and networks to ensure that they adopt reasonable data security measures.

170. As a result, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorneys' fees incurred in this action.

**REQUESTS FOR RELIEF**

Plaintiff, individually and on behalf of members of the Class, as applicable, respectfully requests that the Court enter judgment in her favor and against Defendant, as follows:

171. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's counsel as Class Counsel;

172. That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

173. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent TPSC from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

174. That the Court award Plaintiff and Class Members compensatory, consequential, and general damages in an amount to be determined by a jury at trial;

175. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of its unlawful acts, omissions, and practices;

176. That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

177. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

178. That the Court award pre-and post-judgment interest at the maximum legal rate; and

179. That the Court grant all such other relief as it deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all claims so triable.

Dated: April 29, 2025

*<u>/s/ Matthew R. Mendelsohn</u>*

Matthew R. Mendelsohn
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Telephone: 973-228-9898
Fax: 973-228-0303
Email: mrm@mazieslater.com

Joseph M. Adams
**LAW OFFICE OF JOSEPH M. ADAMS**
200 Highpoint Drive, Suite 211A
Chalfont, PA 18914
Phone: 215-996-9977
Fax: 267-996-4141
Email: josephmadamsesq@verizon.net

**LOCAL CIVIL RULE 11.2 CERTIFICATION**

I hereby further certify that to the best of my knowledge the matter in controversy is the subject of the following actions already proceeding in this District:

1. *Spruell v. The Plastic Surgery Center*; No: 3:25-cv-03304-MAS-JTQ
2. *Timmons v. The Plastic Surgery Center*; 3:25-cv-03307-MAS-JTQ

Dated: April 30, 2025

*/s/ Matthew R. Mendelsohn*

Matthew R. Mendelsohn
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Telephone: 973-228-9898
Fax: 973-228-0303
Email: mrm@mazieslater.com

Joseph M. Adams
**LAW OFFICE OF JOSEPH M. ADAMS**
200 Highpoint Drive, Suite 211A
Chalfont, PA 18914
Phone: 215-996-9977
Fax: 267-996-4141
Email: josephmadamsesq@verizon.net